FILED'11 JAN 25 9:45USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

ALLEN EUGENE STAFFORD,

        Plaintiff,

          v.

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration,

        Defendant.

Civil No. 09-1449-CL

**AMENDED REPORT AND
RECOMMENDATION**

CLARKE, Magistrate Judge.

       This amended Report and Recommendation is filed solely to correct the court's final

Recommendation on page 34 to reflect that the Commissioner's decision be affirmed in part, and

reversed and remanded in part for further proceedings as described below.

       Plaintiff Allen Eugene Stafford brings this action pursuant to section 205(g) of the Social

Security Act, as amended (Act), 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of

the Commissioner's final decision denying plaintiff's application for disability insurance benefits.

For the reasons set forth below, the decision of the Commissioner should be affirmed in part and

reversed and remanded in part for further proceedings consistent with this recommendation.

Page 1 - AMENDED REPORT AND RECOMMENDATION

## BACKGROUND

Plaintiff filed concurrent applications for Social Security Disability (SSD) and Supplemental Security Income (SSI) disability benefits on May 11, 2006, alleging disability beginning March 1, 2003. (Tr. 65-98). His applications were denied initially on August 4, 2006, and again upon reconsideration on December 27, 2006. (Tr. 52-56, 412-426). A hearing on plaintiff's applications was held before an Administrative Law Judge ("ALJ") on March 2, 2009 (Tr. 22). Plaintiff, represented by counsel, appeared and testified, as did a vocational expert ("VE"). On April 24, 2009, the ALJ rendered an adverse decision. (Tr. 19-31). On October 5, 2009, the Appeals Council denied plaintiff's request for review. (Tr. 5-9).

Plaintiff was born November 5, 1979. At the time of the hearing and the ALJ's decision, he was 29 years old. He is 5' 10" tall and weighed 322 pounds. (Tr. 455). Plaintiff completed school through the eleventh grade. (Tr. 74, 92). He has also completed some vocational job training through Job Corps. (Id.). He has past relevant work experience as a cook and an airport food storage clerk. (Tr. 29). Plaintiff alleges disability beginning March 1, 2003, due to degenerative disc disease, diabetes mellitus, reactive airway disease ("RAD"), obesity, obstructive sleep apnea, and attention deficit hyperactivity disorder ("ADHD").

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence, or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995) (*citing* Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989)). In this context, the term "substantial evidence" means more than a mere scintilla, but less

than a preponderance--it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Id.; see also Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). When determining whether substantial evidence exists to support the Commissioner's decision, the court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible of more than one rational interpretation, the court must defer to the Commissioner's conclusion. Moncada, 60 F.2d at 523.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. Howard v. Heckler, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A five-step sequential process is used to determine whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987); Lester v. Chater, 81 F.3d 821, 828 n. 5 (9th Cir. 1995), as amended (Apr. 9, 1996).

At the first step, the Commissioner determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled and the claim is denied. 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I). If not, the inquiry moves to the second step.

At the second step, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments that meets the twelve-month durational requirement. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii). If claimant

does not have such a severe impairment, he is deemed not disabled. Id. If the claimant has a severe impairment or combination thereof, the inquiry moves to the third step.

At the third step, the Commissioner determines whether the claimant's severe impairment meets or equals a "listed" impairment in the regulation. 20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii); 20 C.F.R., Part 404, Subpart P, Appendix 1. If so, disability is conclusively presumed and benefits are awarded. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the Commissioner must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC") before proceeding beyond step three of the disability analysis. 20 C.F.R. §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p.[1] The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, and should reflect the claimant's maximum remaining ability to perform sustained work activities in an ordinary work setting for eight hours a day, five days a week despite limitations imposed by his impairments. SSR 96-8p. The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical and non-medical facts. Id. The RFC is based on all relevant evidence in the case record, including the treating physician's medical opinions about what an individual can still do despite impairments. Id.

At the fourth step, the Commissioner uses this information to determine whether the

---

[1] Social Security rulings are binding on the Administration. *See* Terry v. Sullivan, 903 F.2d 1273, 1275 n. 1 (9th Cir. 1990). Such rulings reflect the official interpretation of the Social Security Administration and are entitled to some deference as long as they are consistent with the Social Security Act and regulations. Massachi v. Astrue, 486 F.3d 1149, 1152 n. 6 (9th Cir. 2007)

claimant can still perform his "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(iv);

416.920(a)(4)(iv).  If the claimant has sufficient "residual functional capacity" to perform his past

work, he is not disabled and the claim is denied.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If the

claimant meets this burden, a prima facie case of disability is established and the inquiry

advances to step five.

At the fifth and final step, the burden shifts to the Commissioner to establish that the

claimant is capable of performing other work that exists in the national economy.  20 C.F.R. §§

404.1520(a)(4)(v), 416.920(a)(4)(v); Yuckert, 482 U.S. at 142; Tackett v. Apfel, 180 F.3d 1094,

1099 (9th Cir. 1999).  If the Commissioner fails to meet this burden, the claimant is deemed

disabled.  20 C.F.R. §§ 404.1520(g), 404.1566, 416.920(g), 416.966.

## THE ALJ'S FINDINGS

In the present case, the ALJ found that plaintiff had not engaged in substantial gainful

activity since March 1, 2003, the alleged onset date of disability, through April 24, 2009, the date

of the ALJ's decision.  (Tr. 24).  The ALJ also determined plaintiff was last insured for Disability

Insurance Benefits on December 31, 2007.  (Id.).  Plaintiff does not contest that determination.

At the second step, the ALJ found that plaintiff suffered from the following medically

determinable impairments:  degenerative disc disease, diabetes, reactive airway disease, and

obesity.  (Tr. 24-25).  The ALJ concluded that these impairments cause more than a minimal

limitation in his ability to perform basic work activities.  (Tr. 24).  The ALJ also noted a remote

diagnosis of ADHD and a recent diagnosis of obstructive sleep apnea secondary to his morbid

obesity, and concluded that these conditions are non-severe.  (Tr. 24-25).

At step three of the analysis, the ALJ found that plaintiff did not have an impairment or

Page 5 - AMENDED REPORT AND RECOMMENDATION

combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 25). Specifically, the ALJ found plaintiff has failed to show that (1) his degenerative disc disease has resulted in either the inability to ambulate effectively on a sustained basis or to perform fine and gross movements effectively on a sustained basis as required by section 1.04; (2) his restrictive airway disease has resulted in a FVC of equal to or less than the values specified in Table II as required by Section 3.02B; (3) he suffers from significant and persistent disorganization of motor function in two extremities, acidosis occurring at least on average once every two months, or retinitis proliferans as required by section 9.08A; and (4) that his obesity does not meet or medically equal the requirement of any listing (SSR 02-01p).

The ALJ found that plaintiff had the residual functional capacity to perform light exertional work. (Tr. 18-23). The ALJ's conclusion is supported by a narrative discussion describing how the evidence supports his assessment of plaintiff's physical and mental limitations, and cites specific medical and non-medical facts.

At the fourth step of the analysis, the ALJ found that plaintiff could not perform his past relevant work. In so finding, the ALJ accepted the opinion of the testifying vocational expert.

At the fifth and final step of the analysis, the ALJ found that plaintiff would be able to perform other work existing in the national economy. Accordingly, the ALJ determined that plaintiff is not disabled.

## DISCUSSION

Plaintiff argues that the ALJ erred by incorrectly determining that his sleep apnea is not severe, and in his assessment of plaintiff's RFC by improperly discrediting the opinion of his

Page 6 - AMENDED REPORT AND RECOMMENDATION

examining physician Dr. Fernstrom, the statement of his lay witness, and his subjective statements. Plaintiff contends that as a result of these errors, the ALJ's RFC assessment does not accurately reflect all of his functional limitations.

To prevail on his Title II claim for disability insurance benefits, plaintiff must show that he was disabled within the meaning of the Social Security Act on or before the date he last satisfied the insured status requirements of the Act. 42 U.S.C. § 423(a)(1)(A); *see* Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). Because Stafford was insured for disability benefits only through December 31, 2007, he must establish a disability on or prior to that date.

There is no insured status prerequisite for his Title XVI claim. 42 U.S.C. § 1382(a). However, supplemental security income payments cannot be made retroactively. 20 C.F.R. §§ 416.203, 416.501; SSR 83-20. As a result, the relevant period for plaintiff's Title XVI claim commenced in May 2006, when he filed his application.

## I. THE ALJ PROPERLY CONSIDERED THE MEDICAL RECORD

Plaintiff argues the ALJ committed reversible error by incorrectly determining that his sleep apnea is not severe, and by improperly discrediting the opinions of his examining physician, Dr. Fernstrom, in favor of non-examining physician Dr. Westfall, regarding his functional capabilities, specifically his ability to lift, stand and walk, and postural limitations.

### A. Plaintiff's sleep apnea

Plaintiff contends the ALJ improperly disregarded the medical record in determining that his sleep apnea is not severe. Plaintiff points to a January 4, 2007, medical record where he reported to his doctor that he was only able to sleep from 11:00 p.m. to 4:00 a.m. and felt "lousy during the day," (Tr. 402); the July 11, 2008, opinion of Dr. Marilyn Rudin, M.D., diagnosing

Page 7 - AMENDED REPORT AND RECOMMENDATION

him with "moderate and chronic sleep apnea" following her analysis of a titration study conducted by the Sleepwell Clinic, (Tr. 282); and his subsequent prescription for a Continuous Positive Airway Pressure (CPAP) machine by Dr. Normy Chiou, M.D., on July 18, 2008, (Tr. 291, 322).

The mere existence of impairment is not proof of a disability. *See* Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993). To be entitled to disability benefits, a claimant must be disabled on or before the date his insured status expires; any subsequent deterioration of his condition is irrelevant. Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1461 n. 4 (1995) (*citing* Waters v. Gardner, 452 F.2d 855, 858 (9th Cir. 1971)). If the claimant applies for benefits after the expiration of his insured status, he must show "the current disability has existed continuously since some time on or before the date that [his] insured status lapsed." Id. at 1458.

The ALJ determined that plaintiff's sleep apnea was not severe based on Dr. Rudin's recommendation that he be prescribed a CPAP device set at 9 cm of pressure "which is relatively low", which he found suggestive of a mildly severe condition. Plaintiff argues that the ALJ's determination is directly contradicted by Dr. Rubin's assessment, which describes his sleep apnea as "moderate," and therefore argues that the ALJ committed reversible legal error by substituting his judgment for that of Dr. Rubin.

The court finds that any error by the ALJ was harmless. Accepting without deciding that plaintiff's sleep apnea was moderate and not mild at the time of Dr. Rubin's diagnosis, that diagnosis was not rendered until July of 2008. Plaintiff has failed to offer any evidence that his sleep apnea existed continuously from a date prior to the expiration of his insured status on December 31, 2007, to the date of diagnosis. The court liberally construes plaintiff's argument as

Page 8 - AMENDED REPORT AND RECOMMENDATION

seeking to establish a continuously existing condition based on his January 4, 2007, report of problems sleeping to his doctor. A review of the January 4, 2007, record reveals that in a follow up visit for recent episodes of severe rectal bleeding and associated pain sitting and defecating, (Tr. 352, 359), plaintiff reported he had been vomiting each night, which he attributed to ongoing family issues, and was experiencing sleep disturbances, specifically, that he could sleep only between the hours of 11 and 4 and felt "lousy" during the day. (Tr. 402). Plaintiff was prescribed Trazodone, Alprazolam, Anusol-HC suppositories or cream, and Phenergan for nausea and vomiting. (Tr. 399). A trial of Trazodone 100 mg "helped him get substantial sleep." (Tr. 402). Plaintiff offers no other evidence to support the conclusion that his sleep apnea pre-existed his July 2008 diagnosis.

The court has carefully examined the entire record and has found only one other reference to problems sleeping, reported on February 19, 2008, to Tom Stewart, Family Nurse Practitioner ("FNP"), at Clackamas County Community Health Division ("CCHD"). (Tr. 406). Plaintiff reported at that time that Trazodone was not helpful, that he was having difficulty getting and staying asleep, and that "[m]ore recently he [had been having] some shortness of breath when lying flat," for which he used supplemental oxygen "which has helped." (Id.). A subsequent note dated May 14, 2008, noted plaintiff "is currently using 2.5 litter canula [sic] at night that he finds quite helpful" and that a sleep study had been scheduled. (Tr. 407). During the hearing the ALJ observed that the record contained these two references to oxygen use, but did not otherwise reflect why plaintiff was using it or whether it medically necessary or discretionary, and posed a series of questions to plaintiff in an attempt to elicit testimony answering these questions. (Tr. 449-451). Plaintiff acknowledged that he had been using oxygen before he was prescribed the

Page 9 - AMENDED REPORT AND RECOMMENDATION

CPAP machine, (Tr. 449, 450), and testified that he was advised to continue with the oxygen after being prescribed the CPAP and the oxygen had been connected to his CPAP, (450), but was unable to provide any information as to when he began using oxygen, who prescribed it, and why it had been prescribed.

The court finds that no reasonable ALJ, considering plaintiff's evidence and this record, could have determined that plaintiff's sleep apnea existed prior to December 31, 2007. Because plaintiff has failed to bear his burden of proof to establish that his sleep apnea existed prior to the expiration of his insured status, the ALJ's determination should be affirmed.

### B. Plaintiff's Functional Capabilities

Plaintiff alleges that his examining physician Dr. Timothy Fernstrom, Doctor of Osteopathic Medicine ("D.O."), diagnosed him with musculoskeletal pain exacerbated by his obesity, diabetes mellitus, reactive airway disease, and ADHD. (Pl. Br. at 8-9). Dr. Fernstrom then opined that plaintiff had no difficulties with sitting, but due to his back pain and problems with immobility could only walk or stand for a short period of time, was unable to lift any weight, and could not bend, stoop, or crouch. (Id. at 9). Plaintiff argues the ALJ committed legal error by rejecting Dr. Fernstrom's opinion regarding his functional limitations in favor of the functional restrictions recommended in the Physical Residual Functional Capacity Assessment ("PRFCA") completed by Dr. Mary Ann Westfall, M.D., the agency's consulting non-examining physician, without providing specific and legitimate reasons for doing so.

#### Standard

Courts categorize physicians as one of three types: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-

examining physicians, who neither examine nor treat the claimant.  Lester, 81 F.3d at 830.  As a general rule, courts weigh the opinions of physicians according to the significance of their clinical relationship with the claimant.  Carmickle v. Comm'r Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008).  An ALJ may only reject the uncontroverted opinion of an examining physician for clear and convincing reasons.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990)).  An ALJ may satisfy the "clear and convincing" standard by noting the presence of conflicting medical opinions in the record which are themselves based on independent clinical findings.  Id..  "The opinions of non-treating or non-examining physicians may . . . serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).  In the face of conflicting medical evidence, it is the sole province of the ALJ to determine credibility and resolve the conflict.  Id. at 956-57.

**1. Dr. Fernstrom Did Not Diagnose Plaintiff with Diabetes, RAD, or ADHD**

Plaintiff's claim that Dr. Fernstrom "diagnosed" him with diabetes mellitus, reactive airway disease, and ADHD, (Pl. Br. at pp. 8-9), lacks merit.  Dr. Fernstrom's report clearly shows that he was unable to confirm these diagnoses.  In the section titled "Diagnoses," Dr. Fernstrom listed musculoskeletal back pain, diabetes mellitus, reactive airway disease, ADHD, and "rash."  It is evident from the face of his report that Dr. Fernstrom was unable to confirm these diagnoses; he simply listed the conditions plaintiff reported in the section titled "Diagnoses," then set out his clinical findings and diagnoses in the comments that follow.

**a. ADHD**

Under "ADHD," Dr. Fernstrom noted simply "this is per the [plaintiff's] history,"

described in the immediately preceding section as plaintiff's statements that he was diagnosed

with ADHD in the first grade, currently taking Bupropion, and that ADHD made it "very

difficult" for plaintiff to hold a job. (Tr. 251, 254). This is not a diagnosis. It is a recitation of a

subjective complaint and the statements offered in support of that complaint. Dr. Fernstrom's

report contains no reference to testing done for ADHD or observations of any symptoms of

ADHD. Dr. Fernstrom did not review any medical records showing plaintiff's diagnosis of or

treatment for ADHD. His opinion contains no conclusion regarding plaintiff's subjective

complaint, and recommends no functional limitation attributable to or appropriate for ADHD.

 The court has carefully examined the record and finds no evidence to support plaintiff's

contention that the medical record supports a diagnosis of ADHD. (Pl. Br. at 10). The record

contains references to plaintiff's childhood use of Ritalin, however, these references are

inconsistent with regard to the dates prescribed, and the medical records for the relevant period

of time are not included in the record in this case. (Tr. 200, 24). The December 22, 2006,

psychiatric review of consulting psychologist Bill Hennings, Ph.D., notes these discrepancies and

the fact that plaintiff did not allege ADHD until after the initial denial of benefits. (Tr. 276). Dr.

Hennings reports he spoke to plaintiff to determine whether any medical records were available,

and that plaintiff told him "no testing ha[d] been done" for his ADHD and "denie[d] any

limitations as a result of ADHD or any psych impairment." (Id.). When asked why the ADHD

had been raised as an issue on his disability benefits claim if it wasn't limiting him, plaintiff

responded he "didn't know" why it had been raised and "denied ever having difficulty working

due to any psych[ological] impairment." (Id.).

 Dr. Fernstrom made no diagnosis of ADHD, therefore the ALJ did not reject his opinion

Page 12 - AMENDED REPORT AND RECOMMENDATION

with regard to ADHD and committed no error by not discussing that section of his report. Furthermore, on this record the court finds that no reasonable ALJ could have found that plaintiff suffers from ADHD, therefore to the extent he erred by not discussing the medical record, the error was harmless.

### b. Diabetes Mellitus

Under "diabetes mellitus" Dr. Fernstrom noted that while plaintiff was being treated for this condition, he did not have access to plaintiff's medical records and therefore could not evaluate control. (Tr. 254). This is not a diagnosis. It is a statement acknowledging Dr. Fernstrom's observation that plaintiff was being treated for a condition which he lacked the ability to confirm or assess. Dr. Fernstrom's report contains no reference to testing done for diabetes, and affirmatively states he did not have access to the medical records showing plaintiff's diagnosis of or treatment for diabetes in order to evaluate his condition. His opinion contains no conclusion regarding plaintiff's subjective complaint.

Despite Dr. Fernstrom's inability to assess plaintiff's diabetes or confirm the diagnosis, the ALJ determined at step two that plaintiff suffers from diabetes and included it among plaintiff's "severe" conditions. Moreover, Dr. Westfall offered no conclusion regarding plaintiff's diabetes, therefore the ALJ did not reject Dr. Fernstrom's opinion in favor of Dr. Westfall's opinion. While plaintiff is correct that the ALJ rejected the opinion of Dr. Fernstrom with regard to his diabetes, the court concludes this is harmless error because the ALJ's determination was in plaintiff's favor and is supported by the substantial evidence in the record.

### c. Reactive Airway Disease ("RAD")

Under "reactive airway disease" Dr. Fernstrom noted he was unable to find any objective

evidence to substantiate the diagnosis, and would require a pulmonary function test or Methacholine challenge test in order to assess plaintiff's condition. (Id.). This is not a diagnosis. It is an acknowledgment of a diagnosis based on a single incident occurring December 29, 2004, (Tr. 138-160), which Dr. Fernstrom found unsupported by objective medical evidence and concluded he lacked the ability to confirm or assess without performing specific medical testing which he was unable to conduct at the time of his examination.

Despite Dr. Fernstrom's opinion, the ALJ determined at step two that plaintiff suffers from RAD and concluded that it was severe. Plaintiff is correct that by doing so the ALJ rejected the opinion of Dr. Fernstrom. However, this determination weighs in plaintiff's favor. Moreover, the ALJ accommodated plaintiff's RAD in his RFC assessment by incorporating the environmental restriction recommended by Dr. Westfall that plaintiff avoid concentrated exposure to fumes, dust, smoke, etc. The court therefore finds that any error by the ALJ in rejecting Dr. Fernstrom's opinion regarding his RAD is harmless, and presents no grounds for reversal or remand.

### 2. Plaintiff's Functional Restrictions

The functional restrictions recommended by Dr. Fernstrom and Dr. Westfall are consistent in several ways. Both found that plaintiff did not have any manipulative, visual, or communicative limitations. (Tr. 255, 259-260). Dr. Fernstrom found no objective evidence to limit plaintiff's ability to sit during an eight-hour workday, (Tr. 254), consistent with Dr. Westfall's opinion that plaintiff could sit for about 6 hours in an eight-hour workday, (Tr. 257), the maximum indicated as a choice under that exertional limitation category. Neither recommended any restriction in plaintiff's ability to push or pull. (Tr. 254-255, 257). While Dr.

Fernstrom did not recommend any environmental limitations due to back pain or limited mobility, Dr. Westfall recommended that plaintiff avoid hazards such as heights and machinery to accommodate his obesity and use of prescription narcotic medications.  (Tr. 260).

Dr. Fernstrom's and Dr. Westfall's opinions differ slightly with respect to postural limitations.  Dr. Fernstrom opined that plaintiff would have difficulty bending, stooping and crouching, and would not be able to perform these activities in a job setting.  (Tr. 254).  Dr. Westfall also found that plaintiff demonstrated limited mobility, but recommended a less restrictive limitation of only occasional stooping, kneeling, crouching, and crawling.  (Tr. 258). Dr. Westfall also recommended that plaintiff should only occasionally be required to climb stairs or ramps, and should never be required to climb ladders, ropes, or scaffolds.  (Id.).

The opinions of Dr. Fernstrom and Dr. Westfall differ significantly with respect to plaintiff's ability to stand, walk, and lift or carry weight.  Dr. Fernstrom opined that it would be difficult for plaintiff to stand or walk for more than a short period of time due to his back pain, (Tr. 254), while Dr. Westfall opined he could stand or walk for up to 6 hours, the maximum indicated as a choice in that category, (Tr. 257).  Dr. Fernstrom also opined that plaintiff would be unable to lift any amount of weight due to his back pain and limited mobility, (Tr. 254), while Dr. Westfall opined plaintiff could lift up to 50 pounds occasionally and up to 25 pounds frequently.  (Tr. 257).

**The Medical Records Reviewed by Dr. Fernstrom**

Plaintiff reported chronic back pain stemming from his involvement in a high speed, rear-end car accident in 1999.  (Tr. 250).  Dr. Fernstrom observed that plaintiff "move[d] with discomfort from the chair to the examination table" and that he had "difficulty removing his shoes and socks

and [did] so with his opposing foot." (Tr. 252). He recorded plaintiff's statements that he

"occasionally" experienced numbness, but "never" weakness, in his left leg, but that he did not

have "any radiation or weakness" in his right leg. (Tr. 250-51). On examination of plaintiff Dr.

Fernstrom noted significant immobility, and in particular noted a "significant expression of pain"

and "marked paravertebral hypertonicity" when evaluating plaintiff's range of motion for his hip

joints. (Tr. 253). Dr. Fernstrom's examination of plaintiff yielded normal results for strength

testing, muscle bulk and tone. (Id.). A sensory examination revealed that "[s]ensation is intact to

light touch and pinprick throughout the bilateral upper and lower extremities." (Id.). Based on

his examination, Dr. Fernstrom found that plaintiff "appear[ed] to have significant immobility,

secondary to his back pain," and concluded that his pain symptoms were exacerbated by his

obesity. (Tr. 254). However, he found no evidence of radiculopathy and opined that the majority

of plaintiff's pain was likely secondary to his 1999 motor vehicle accident injury and residual

musculoskeletal pain. (Tr. 250, 254).

    The medical records inspected by Dr. Fernstrom relevant to plaintiff's musculoskeletal

back pain show that on November 4, 2003, plaintiff presented at Providence Milwaukie Hospital

("Providence") with complaints of lower back pain. (Tr. 175-182). Plaintiff reported he had

been helping a friend move a big wooden hutch up a stairway when he lost his balance and fell

backward, landing on his back. (Tr. 181). The attending emergency room doctor, Dr. Mark N.

Roberts, D.O., noted past significant medical history for prior back injuries associated with

moving furniture, but did not describe those prior incidents or provide dates. (Id.). Plaintiff was

prescribed Vicodin, Motrin, and Flexeril, and discharged with instructions to avoid heavy lifting.

(Tr. 182).

Page 16 - AMENDED REPORT AND RECOMMENDATION

On November 14, 2003, plaintiff presented at Providence with complaints of right upper extremity pain after the throttle of the all terrain vehicle ("ATV") he was riding got stuck, causing him to crash into a house. (Tr. 169-174, 183-185). Plaintiff denied any significant chronic health problems and denied any pain involving his neck or back. (Tr. 183). X-rays of plaintiff's right shoulder and forearm were negative for fracture and dislocation. (Id.). The attending emergency room doctor, Dr. James E. Maras, M.D., noted that "[plaintiff's] description of pain is somewhat disproportionate to the actual physical findings." (Id.). Dr. Maras declined plaintiff's prescription request for Percocet and Soma, and instead prescribed Vicodin for pain and discharged with instructions to ice the affected area and return in 3-4 days for follow up. (Tr. 183-84).

On April 15, 2004, plaintiff again presented at Providence with complaints of lower back pain, reporting he had spent six hours the day before, April 14, moving furniture at a friend's house. (Tr. 161-168). He was given two Percocet tablets for pain, a prescription for Vicodin, and discharged in no distress. (Tr. 167). An x-ray of the lumbar spine showed that the "five lumbar vertebral bodies [were] normally aligned and intact," that "[t]he disc spaces and vertebral body heights are preserved," and revealed no fracture. (Tr. 168).

On March 16, 2005, Dr. Daniel R. Kocarnik, M.D., at Epic Imaging conducted a MRI of plaintiff's lumbar spine at the request of FNP Stewart, which showed a mild left posterolateral disc protrusion at the T6-7 level. (Tr. 187-234, 241). However, the vertebral bodies were normal in alignment and stature, with nor compressions or post-traumatic deformities evident and disc interspaces generally well preserved. (Id.).

//

Page 17 - AMENDED REPORT AND RECOMMENDATION

**The Medical Records Reviewed by Dr. Westfall**

Dr. Westfall reviewed Dr. Fernstrom's report, the medical records he relied on, and several additional medical records including records of office visits to CCHD in 2005 and 2006, and an August 10, 2006, MRI of plaintiff's lumbar spine, none of which were provided to or reviewed by Dr. Fernstrom.

These additional medical records show that on March 14, 2005, plaintiff was seen by FNP Stewart at CCHD for complaints of a rash or bruise on his back occurring intermittently since 1997 following exercise or physical stress. (Tr. 219-221). Although his physical examination of plaintiff yielded normal results, FNP Stewart ordered an MRI. (Tr. 219). As discussed above, while the March 16 MRI showed a mild left posterolateral disc protrusion at the T6-7 level, the vertebral bodies were normal in alignment and stature, no compressions or post-traumatic deformities were evident, and disc interspaces generally well preserved. (Tr. 241).

FNP Stewart next saw plaintiff on February 9, 2006, for complaints of back pain, respiratory infection, and for a blood sugar check. (Tr. 212-213). A physical examination yielded normal results. (Tr. 212). Plaintiff reported that he had joined a gym and had been traveling with a wrestling business he was involved in. (Id.). He requested, and FNP Stewart prescribed, a refill on Oxycodone and Vicodin sufficient "to bring him through a 6-week out-of-state travel starting the end of March." (Id.; *see also* Tr. 210-211, 223-224).

On May 3, 2006, FNP Stewart saw plaintiff again for complaints of thoracic back pain. (Tr. 208-209). Plaintiff reported he had lost his job with the wrestling business because he could not lift significant weight such as a 2 x 6 x 8 piece of lumber or ring rails weighing 40 pounds. (Tr. 209). A physical exam yielded normal results and no radicular symptoms. (Id.). FNP

Page 18 - AMENDED REPORT AND RECOMMENDATION

Stewart referred plaintiff to a spine clinic, recommended physical therapy and provided information for a chiropractic clinic, refilled plaintiff's Oxycodone and Vicodin prescriptions, and "[d]iscussed briefly disability process." (Id.). On May 25, 2006, plaintiff filed his disability application, alleging disability due to back pain and diabetes. (Tr. 65-79).

On August 9, 2006, FNP Stewart saw plaintiff for complaints of thoracic and lumbar back pain and subjective reports of numbness in his left leg, resulting in his knee buckling if he was not careful. (Tr. 204). An examination revealed "decreased sensation on bilateral heels, metatarsal heads, and the ball of the foot," which Stewart attributed to "thick calluses in that areas and signs of tinea infection." (Id.). Plaintiff also indicated he "would like to revisit the issue of ADHD." (Id.). Stewart noted that plaintiff stated "he was on Ritalin from kindergarden [sic] through the twelfth grade, prescribed by a family doctor," but noted he did not have those records. (Id.). Stewart discontinued plaintiff's Oxycodone prescription and increased his Vicodin prescription to three per day, writing a prescription for two and a half weeks to accommodate an out of state trip at the end of August and beginning of September. (Id.).

An August 10, 2006, MRI resulted in a "normal examination" determination, again noting normal alignment and stature of vertebral bodies, no compressions or posttraumatic deformities, nicely maintained disc interspaces with good preservation of disc height, and no significant disc bulges or localized protrusions. (Id.). A six-view MR myelogram obtained at the time of the MRI revealed no pathological signal changes and good preservation of signal character throughout the lumbar spine. (Id.).

At a September 21, 2006, follow up visit, FNP Stewart noted that the August 10 MRI results were normal, that plaintiff was walking "approximately a block," and that he "provided

Page 19 - AMENDED REPORT AND RECOMMENDATION

school records regarding use of Ritalin up to 30 mg a day as a child." (Tr. 200). Stewart referred

plaintiff to the Behavior Health Consultants regarding his alleged ADHD and prescribed

Wellbutrin "for the hyperactivity.", (Id.). However, it appears that plaintiff did not discuss his

alleged ADHD with the Behavior Health Consultants: a September 21 Behavior Health Referral

and Report discusses exclusively measures to help plaintiff manage his pain and blood sugar, and

contains no mention of ADHD or any associated symptoms. (Tr. 202).[2]

On October 19, 2006, plaintiff was seen at CCHD for complaints of numbness and pain

in his feet persisting for two days; however, a foot examination yielded results within normal

limits. (Tr. 199).

Based on her review of these records and Dr. Fernstrom's report, Dr. Westfall concluded

that Dr. Fernstrom's assessment of plaintiff's limitations was not supported by his examination,

the objective evidence, or plaintiff's activities of daily living. (Tr. 262). Specifically, Dr.

Westfall opined that Dr. Fernstrom's opinion could not be given "full weight," (Tr. 262), because

it relied heavily on plaintiff's subjective pain reports and Dr. Fernstrom's observation of plaintiff's

limited mobility during the exam, (Tr. 261-262). Dr. Westfall noted that while plaintiff's

activities of daily living exceeded the limitations he alleged, his morbid obesity alone posed

physical limitations, (Tr. 262-263), and that the limited mobility he demonstrated during Dr.

Fernstrom's exam could reasonably be attributed to his obesity, (Tr. 261). She further noted that

there were "no findings to support the level of pain [plaintiff] report[ed]." (Id.). While she did

---

[2] On careful examination of the entire record it does appear that plaintiff was seen by a
Behavioral Health Consultant once on May 8, 2007. That Behavioral Health Referral and Report
noted plaintiff "complain[ed] the legal system expects more from him than others with no serious
issues" and assessed him as showing "poor problem solving and coping skills" and displaying
"less attention deficit issues than [learning disability] and low functioning." (Tr. 411).

find that "some limitations" were warranted based on the objective findings and plaintiff's

obesity, as described below, she concluded that plaintiff was capable of functioning under less

severe restrictions than those recommended by Dr. Fernstrom. (Tr. 262).

### The ALJ's Determination

The ALJ accepted the opinions of Dr. Fernstrom and Dr. Westfall where they concurred,

incorporating no limitation on plaintiff's ability to sit, manipulate, see, or communicate into his

RFC determination. The ALJ also incorporated the uncontested recommendations of Dr. Westfall

that plaintiff avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and

similar conditions; that he should never balance, use ladders, ropes, or scaffolds; and that he be

limited to only occasional climbing of ramps and stairs.[3]

The ALJ restricted plaintiff to performing light work, defined in the cited statutes as

occupations requiring either "a good deal of walking or standing" or "sitting most of the time

with some pushing and pulling of arm or leg controls," lifting no more than 20 pounds, and

frequently lifting or carrying up to 10 pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). "[U]nless

there are additional limiting factors such as loss of fine dexterity or inability to sit for long

periods of time," a person capable of light work is also deemed capable of doing sedentary work.

Id.  Sedentary work is defined as work involving sitting but often requiring "a certain amount of

walking and standing," lifting no more than 10 pounds, and occasionally lifting or carrying

"articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a).

---

[3] The ALJ also limited plaintiff to work "requiring only occasional interaction with the
general public." (Tr. 26). It is unclear to the court why the ALJ adopted this limitation, e.g.
whether it is a limitation to accommodate plaintiff's use of prescription narcotics, his subjective
allegations of difficulty maintaining concentration, or something else entirely. However, neither
party has raised an objection to this restriction, therefore the court need not reach that issue.

However, the ALJ imposed the additional restriction that plaintiff should stand or walk for a total of only two to four hours per day. (Tr.26).

### a. Plaintiff's ability to lift

By restricting plaintiff to light work as defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b), the ALJ adopted Dr. Westfall's opinion that plaintiff could lift up to 50 pounds and frequently lift up to 10 pounds, and rejected Dr. Fernstrom's opinion that plaintiff was unable to lift any amount of weight. An ALJ may reject an opinion of an examining physician, if contradicted by a non-examining physician, as long as the ALJ gives "specific and legitimate reasons that are supported by substantial evidence in the record." Moore v. Comm'r of Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002) (citing Lester, 81 F.3d at 830-31). The ALJ's reasons for rejecting Dr. Fernstrom's opinion with regard to plaintiff's ability to lift meet that standard.

The ALJ found that Dr. Fernstrom's recommendations were inconsistent with his own observations and the substantial evidence in the record. (Tr. 29). The medical records reviewed by Dr. Fernstrom show that plaintiff sustained lumbar strains in November of 2003 while lifting and carrying a big wooden hutch up stairs, and again in April of 2004 after spending six hours moving furniture with a friend. Dr. Fernstrom also reviewed the April 15, 2004, x-ray of plaintiff's lumbar back which showed the vertebral bodies were normally alighted and intact, disc spaces and vertebral heights preserved, and no fracture. Plaintiff's injury is a type commonly associated with heavy lifting and the treatment he received was moderate and routine: he was prescribed oral pain medication and discharged. Nothing about these incidents supports the conclusion that he was unable to lift any weight either at the time those injuries occurred in 2003 and 2004, or at the time of Dr. Fernstrom's opinion on December 9, 2006. While Dr. Fernstrom

Page 22 - AMENDED REPORT AND RECOMMENDATION

also reviewed the March 16, 2005, MRI showing mild leftward disc protrusion at the T6-7 level but otherwise yielding normal results and showing no compressions or post-traumatic deformities, (Tr. 241), it does not appear that he was aware that on March 14 FNP Stewart physically examined plaintiff with normal results. Nor does it appear that Dr. Fernstrom reviewed plaintiff's August 10, 2006, MRI which yielded normal results, (Tr. 239). Dr. Fernstrom therefore made his assessment without the benefit of plaintiff's full medical record and most recent examination, both of which were available to Dr. Westfall.

The ALJ rejected Dr. Fernstrom's opinion in part because he did not appear to have evaluated or considered whether plaintiff "was giving his best effort or was engaging in symptom exaggeration." (Id.). The ALJ appears to have found this particularly troubling in light of his adverse determination as to plaintiff's credibility and the lack of any restrictions imposed by any of plaintiff's treating medical care providers. (Id.). An opinion of disability "premised to a large extent upon the claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints have been "properly discounted." Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989). As described below, the ALJ properly determined that plaintiff's subjective complaints of pain were not entirely credible. Finally, the ALJ noted that plaintiff directly contradicted Dr. Fernstrom's opinion, testifying at the hearing that he could lift up to ten pounds for two to three hours in an eight hour day. (Tr. 28, 454).

On this record, the ALJ permissibly rejected the medical opinion of a non-treating examining physician that he found to be unsupported by the record as a whole. *See* Batson v. Comm'r, 359 F.3d 1190, 1195 (9th Cir. 2004); *see also* Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting a treating physician's opinion as conclusory and supported by minimal

Page 23 - AMENDED REPORT AND RECOMMENDATION

clinical findings); <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751-55 (9th Cir. 1989) (same).  Therefore his determination with regard to plaintiff's ability to lift should be affirmed.

### b. Plaintiff's ability to walk and stand

The court is unable to determine whether and to what extent the ALJ rejected or accepted the opinions of Dr. Fernstrom and Dr. Westfall as to plaintiff's ability to stand or walk.  Dr. Fernstrom opined that plaintiff could stand or walk "for a short period of time," but did not state an appropriate number of hours for these activities.  The ALJ limited the plaintiff to standing or walking no more than two to four hours per day.  This limitation is more restrictive than Dr. Westfall's opinion that plaintiff could stand or walk for up to six hours in an eight-hour work day, therefore the ALJ apparently did not accept her opinion.  However, it is unclear whether the ALJ felt that a limitation of two to four hours complied with Dr. Fernstrom's opinion that plaintiff could walk or stand for only a "short" period of time, or whether this restriction was intended to strike a balance between the conflicting medical opinions.

It is also unclear what other evidence in the record the ALJ relied on in reaching his determination that plaintiff could stand or walk for two to four hours.  The ALJ noted plaintiff's testimony at the hearing that he could stand for up to 20 minutes at a time and walk a maximum of 200 feet before needing to rest.  (Tr. 27, 448, 452).  However, the ALJ's questions at the hearing were phrased in the present tense: "[h]ow far can you walk?" (Tr. 448), and "[h]ow long can you stand for?" (Tr. 452).  Therefore, plaintiff can only be understood as testifying with regard to his ability to stand and walk as of the time of the hearing on March 2, 2009, not regarding his ability to stand and walk between March of 2003, the alleged onset date, and December 31, 2007, the date on which his insured status expired.

Page 24 - AMENDED REPORT AND RECOMMENDATION

Plaintiff alleges that his difficulty standing and walking is the primarily the result of diabetic neuropathy, specifically, that he has no feeling in the bottom of his feet which in turn causes his right leg, knee, and hip to "give out" or buckle. (Tr. 445, 452). However, plaintiff affirmatively alleges that he was not diagnosed with diabetes until sometime in 2004, and was not diagnosed with neuropathy until 2009. (Pl. Br. at 15). Moreover, in December of 2006 he reported to Dr. Fernstrom that he only occasionally had numbness and never weakness in his left leg, and did not have any radiation or weakness in his right leg. (Tr. 250-251). Therefore, to the extent that he developed neuropathy causing his right leg, knee, and hip to "give out" frequently, it must have developed after December of 2006.

Careful examination of the entire record shows that plaintiff first reported tingling in his feet on April 30, 2007, during a visit with FNP Stewart at CCHD. (Tr. 364). Stewart saw plaintiff again on September 28 for continued complaints of numbness and tingling, and recorded plaintiff's first diagnosis of "mild foot neuropathy on foot examination" after conducting a lower extremity amputation prevention ("LEAP") diabetic foot exam. (Tr. 367, 401, 405). Plaintiff reported no improvement in the tingling in his feet on December 18. (Tr. 371). On May 14, 2008, plaintiff again reported tingling, this time in both his hands and his feet. (Tr. 373).

In July of 2008 plaintiff transferred from CCHD to Multnomah County Health Department East Clinic ("MCHD") for primary care. (Tr. 312-347). Dr. Chiou noted plaintiff's diabetic neuropathy diagnosis in his initial review of plaintiff's records on July 18, 2008, recording that plaintiff "was to be referred but unclear where to." (Tr. 322-323). He recorded normal neurological exam results and normal range of motion, (Tr. 323), which were also recorded in subsequent visits on August 15 and October 22, (Tr. 317, 219-320).

On December 9, 2008, plaintiff was seen by Karen Campbell, Nurse Practitioner ("NP"), for complaints of foot pain which he reportedly believed was neuropathy. (Tr. 315). NP Campbell conducted a foot exam and recorded "normal pedal pulses, normal sensory exam, no trophic changes or ulcerative lesions, corns/calluses, present to the plantar surface of the foot both heels and forefoot with thick callous formation, hygiene: good and normal monofilament exam." (Tr. 316). The last medical record from MCHD shows NP Campbell conducted a foot exam and recorded "normal pedal pulses, normal sensory exam, no trophic changes or ulcerative lesions, hygiene: good and reduced sensation at right great toe." (Tr. 313).

The medical record therefore shows that plaintiff has developed diabetic neuropathy, however, it does not appear that the neuropathy existed to a significant degree prior to the expiration of his insured status on December 31, 2007. Notably, plaintiff's employment with the wrestling business, first referenced in FNP Stewart's February 9, 2006, progress note, required him to travel for extended periods of time up to six weeks. (Tr. 212). As noted in FNP Stewart's May 3, 2006, progress note, plaintiff reported losing that job due to an inability to lift substantial weight, not an inability to walk or stand. (Tr. 209). ALJ does not discuss or interpret the relevant medical evidence in his opinion. While the ALJ does not need to discuss every piece of evidence, he must develop the record and interpret the medical evidence that is significant and probative. Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (internal citations and quotation marks omitted). On remand, the ALJ should clarify his determination as to plaintiff's ability to walk and stand, and in so doing specifically address plaintiff's assertion of impairment due to diabetic neuropathy and the relevant, probative medical evidence which supports or refutes plaintiff's allegations.

Page 26 - AMENDED REPORT AND RECOMMENDATION

### c. Plaintiff's postural limitations

Both Dr. Fernstrom and Dr. Westfall opined that plaintiff had some postural limitations, although they disagreed as to the extent and limiting effects. Dr. Fernstrom opined that plaintiff would have "difficulty with bending, stooping and crouching, and would not be able to perform these activities in a job setting" based a diagnosis of musculoskeletal back pain exacerbated by obesity. (Tr. 254). Dr. Westfall disagreed with Dr. Fernstrom as to the cause of plaintiff's limited mobility, opining it was attributable to his obesity rather than alleged back pain; however, she agreed that some postural limitations were appropriate, and recommended he be limited to only occasional stooping, kneeling, crouching, and crawling. (Tr. 258, 261).

The ALJ found that Dr. Westfall's opinion was "consistent with the clinical record and accurately describ[ed] the functional impact of the medically determinable impairments on [plaintiff]," noting that she recommended plaintiff be limited to only occasional stooping, kneeling, crouching, and crawling. (Tr. 29). However, the ALJ failed to incorporate these restrictions into either his assessment of plaintiff's CFR or the hypothetical posed to the VE at the hearing. The ALJ therefore either inadvertently omitted these restrictions or determined that they did not apply, without explaining which it is in his decision. Where a hypothetical fails to reflect each of the claimant's limitations that is supported by substantial evidence, the VE's answer has no evidentiary value. Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The case should therefore be remanded to allow the ALJ to consider the weight to which the opinions are entitled and, if the opinions are entitled to little or no weight, to state clear and convincing reasons on the record for their rejection. On remand, the ALJ should also reformulate the hypothetical to the VE to include all applicable limitations, and to elicit specific testimony from the VE regarding

each limitation to determine whether the they apply to the occupations identified as available to plaintiff, and how they affect his prospects for employment. *See* Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal quotation marks omitted).

### Conclusion

On this record, the court finds that the ALJ properly considered the medical record when determining plaintiff's ability to lift. To the extent that the ALJ rejected the functional restrictions recommended by Dr. Fernstrom, he provided clear and convincing reasons for doing so. The court finds the ALJ's determination is supported by the substantial evidence in the record.

However, the ALJ did not properly consider the medical record with regard to plaintiff's ability to walk and stand or his postural limitations. On remand, the ALJ should develop the probative medical record regarding plaintiff's limitations, if any, and either provide clear and convincing reasons for rejecting the functional limitations suggested by Dr. Fernstrom and Dr. Westfall, or reformulate the hypothetical posed to the VE to include all applicable limitations.

## II. PLAINTIFF'S CREDIBILITY

Plaintiff asserts that the medical record supports his allegations of the functional restrictions caused by his back pain, diabetes, reactive airway disease, and ADHD, and argues the ALJ's reasons for discrediting his testimony are not supported by the substantial evidence in the record. Defendant responds that the ALJ gave clear and convincing reasons to discredit plaintiff's claims, and properly found plaintiff to be less than credible based on his record of conservative treatment, and his vague, evasive, and unreliable testimony, which was inconsistent

Page 28 - AMENDED REPORT AND RECOMMENDATION

with the medical evidence in the record.

### Standard

The ALJ may consider several factors when weighing the claimant's credibility, including:  claimant's reputation for truthfulness; inconsistencies in claimant's testimony and between claimant's testimony, conduct, and daily activities; claimant's work record; and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms complained of.  Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005); Thomas, 278 F.3d at 958-59.  "An ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment."  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (*quoting* Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).  However, the ALJ must provide "specific, cogent reasons" for discrediting a claimant's testimony when a medical impairment has been established.  Morgan, 169 F.3d at 599 (*quoting* Lester, 881 F.3d at 834).  If the ALJ finds the claimant's testimony regarding his symptoms and limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive.  Id.  Absent evidence that the claimant is malingering, the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony.  Id.  The court will not second-guess the ALJ's credibility finding if it is supported by substantial evidence in the record.  Thomas, 278 F.3d at 959.

The ALJ determined that plaintiff's impairments could reasonably be expected to produce some degree of the symptoms alleged by him but his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were disproportionate and inconsistent with the substantial evidence in the record.

The ALJ first found that while plaintiff reported a history of chronic lower back pain, the

medical record contains only minimal objective findings and reflects only conservative treatment consisting exclusively of prescribed pain medications. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and it's disabling effects." Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (*citing* 20 C.F.R. § 404.1529(c)(2)); *see* 20 C.F.R. § 416.929(c)(2). The ALJ noted that plaintiff took great pains to highlight his back pain and testified that his L1 and L2 discs were pushing together. (Tr. 447). However, plaintiff failed to mention that the most recent MRI done of his lumbar back on August 10, 2006, showed entirely normal results, and specifically that there were "no compressions or posttraumatic deformities." (Tr. 239). This is consistent with the April 16, 2004, x-ray which revealed normally aligned and intact vertebral bodies and no fracture. (Tr. 168). Likewise, while the March 16, 2005, MRI showed a mild leftward disc protrusion at the T6-7 level, it showed no compressions or post-traumatic deformities. (Tr. 241). The ALJ found significant that none of plaintiff's treating medical care providers recorded any objective evidence that plaintiff's subjective complaints could be attributed to the MRI results or imposed any restrictions on his ability to work.

The ALJ also found that plaintiff had a tendency to exaggerate both his symptoms and focus exclusively the medical evidence supporting it. A tendency to exaggerate is a legitimate consideration in determining credibility. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). As an example, the ALJ cited plaintiff's testimony at the hearing that he could lift only ten pounds for two to three hours per eight hour day and found it inconsistent with his report to FNP Stewart in May of 2006 that he was unable to lift substantial weights up to 40 pounds.

Page 30 - AMENDED REPORT AND RECOMMENDATION

Plaintiff correctly argues that an inability to lift 40 pounds is not necessarily inconsistent with an ability to lift 10 pounds. However, as noted above, the job also required plaintiff to travel for up to six weeks at a time, which the ALJ found indicated plaintiff's activities of daily living were greater than he generally reported, and suggested his limitations and symptoms might have been overstated. This finding is supported by the substantial weight of the evidence and consistent with plaintiff's medical records, which demonstrate that he engaged in heavy and protracted lifting and carrying in 2003 and 2004. In both cases, he received routine, conservative treatment in the form of limited prescription pain medication. And on November 14, 2004, plaintiff was sufficiently recovered from his November 4 lumbar strain to go ATV riding. After crashing the ATV into a house on November 14, plaintiff was seen in the emergency room where his treating doctor noted his "description of pain is somewhat disproportionate to the actual physical findings." (Tr. 183).

The ALJ also found that plaintiff required little treatment for back pain other than taking prescribed medications. Conservative treatment is a sufficient reason to discount a claimant's testimony regarding the severity of an impairment. Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007). Plaintiff contends he is only able to manage his pain through the use of heavy medication and that he has elected not to have back surgery only because he has been led to believe it might make his back pain worse. However, there is no indication in the record that plaintiff has actually consulted with a neurosurgeon or any other doctor regarding back surgery. Although it appears plaintiff inquired about physical therapy in 2006, there is no indication that he has ever sought or received treatment by a physical therapist. (Tr. 234, 266). And while the record clearly shows that plaintiff has been prescribed narcotic pain medication for years for back

Page 31 - AMENDED REPORT AND RECOMMENDATION

pain, it also shows that in October 2008 NP Campbell at MCHD referred his file to the opiate oversight committee following two successive negative urine drug screens ("UDS"), (Tr. 317), and that his Vicodin prescription was discontinued at the opiate oversight committee's recommendation, (Tr. 313). Plaintiff testified this was done due to concerns he was diverting the narcotic prescription. (Tr. 453-454). After his narcotic prescription was discontinued, plaintiff changed medical care providers and at the time of the hearing was under the care of a Dr. Brent Hoffman, who he testified put him back on prescription narcotic pain medication. (Tr. 456-457). The ALJ granted plaintiff 14 days from the date of the hearing to file an opinion letter from Dr. Hoffman regarding his limitations, (Tr. 440), however, it appears plaintiff failed to submit this letter as it is not found in the record.

### Conclusion

The ALJ's reasons for discounting plaintiff's credibility determination are supported by substantial evidence in the record.

## III. LAY WITNESS CREDIBILITY

Plaintiff contends that the ALJ failed to consider the statement of his wife, Amy Stafford, as a lay witness, or, in the alternative, that the ALJ failed to provide clear, convincing, and germane reasons for not fully crediting her statement.

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 510-11 (9th Cir. 2001) (*citing* Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)). An ALJ may not reject lay testimony without explanation, but may reject the testimony if it is inconsistent with the medical

Page 32 - AMENDED REPORT AND RECOMMENDATION

evidence. Id. (citing Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984)).

Ms. Stafford submitted a third party function report in support of plaintiff's benefits application, describing her observation of plaintiff's medical and mental impairments. (Tr. 80-87). She indicated his problem was his back, which since 1999 had affected his ability to work, get around, and sleep. (Tr. 81). Ms. Stafford stated plaintiff was able to prepare meals for himself and the family 2-3 times per week, and help with household chores such as making beds, vacuuming, picking up around the house, and helped her take care of their children. (Tr. 81-82). She indicated he could play on the computer 2 hours per day, spend 2 hours or less 1-2 days per week playing with their children, shop for food once a month using a mobile cart, and attend wrestling shows once per month. (Tr. 83-84). She indicated he could walk for less than a block before needing to rest 5 to 10 minutes to recover, that he had no problems paying attention but sometimes had difficulty following instructions. (Tr. 85). She indicated he did "alright" handling stress and was able to handle changes in routine. (Tr. 86). In the section requiring her to check off the boxes indicating what activities plaintiff's "illnesses, injuries, or conditions" affected, Ms. Stafford indicated plaintiff was affected in his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. (Tr. 85). Despite form instructions, Ms. Stafford did not provide any narrative description of how he was affected in these areas. (Id.). On the last page, titled "remarks," Ms. Stafford simply stated plaintiff had to take "quite a bit of meds" for his diabetes and his back problems. (Tr. 87).

The parties disagree on whether the ALJ's citation to the record without further discussion is sufficient to demonstrate that he considered Ms. Stafford's statement and to satisfy the ALJ's burden to provide clear and convincing reasons for rejecting Ms. Stafford's statement. The court

need not decide that question. Ms. Stafford's function report is generally consistent with the postural limitations which both Dr. Fernstrom and Dr. Westfall found appropriate, with the exception that both doctors found plaintiff had no manipulative limitations, which as defined on the form (SSA-4734-BK) completed by Dr. Westfall, includes reaching in all directions, and the abilities to handle (gross manipulation), finger (fine manipulation), and feel (skin receptors). (Tr. 259). As described above, the ALJ's decision indicated that the postural limitations recommended by Dr. Westfall were appropriate yet failed to incorporate the postural limitations into his RFC assessment and the hypothetical posed to the VE. The court therefore recommends that the case be remanded to allow the ALJ to consider the weight to which the opinions are entitled and reformulate the hypothetical to the VE to include all applicable limitations. On remand, the ALJ shall include in his discussion a determination regarding the weight to which Ms. Stafford's statement is entitled, if any.

The court has also recommended that the case be remanded for clarification as to plaintiff's exertional limitation with regard to his ability to stand and walk. The ALJ should incorporate into his decision a discussion of Ms. Stafford's statement to the extent that it supports of fails to support his determination in that regard.

## RECOMMENDATION

Based on the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision that plaintiff did not prove disability and is not entitled to disability insurance benefits or supplemental security income under Titles II and XVI of the Social Security Act is based on correct legal standards and supported by substantial evidence. Therefore, it is recommended that the Commissioner's decision be affirmed in part and reversed and remanded in part for further

proceedings consistent with this recommendation, as described above.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due by February 14, 2011. If objections are filed, any response to the objections are due by March 4, 2011. See* Fed. R. Civ. P. 72, 6.

DATED this _____ day of January, 2011.

MARK D. CLARKE
United States Magistrate Judge